THE STATE EX REL. CINCINNATI ENQUIRER, APPELLEE AND CROSS-APPELLANT, *v.* SAGE, JUDGE, ET AL., APPELLANTS AND CROSS-APPELLEES.

[Cite as *State ex rel. Cincinnati Enquirer v. Sage,* 142 Ohio St.3d 392, 2015-Ohio-974.]

(No. 2013–0945—Submitted May 28, 2014—Decided March 19, 2015.)

———

FRENCH, J.

{¶ 1} In this case, we determine the fate of a public-records request made by appellee/cross-appellant, the Cincinnati Enquirer. The Enquirer sought the

recording of an outgoing phone call placed by a Butler County 9–1–1 dispatcher. We find that the recording is a public record under R.C. 149.43. We therefore affirm the court of appeals' decision holding that the Enquirer was entitled to a writ of mandamus ordering the release of the recording. We also affirm the court's award of statutory damages to the Enquirer. We find, however, that the court of appeals abused its discretion in not awarding attorney fees, and we reverse that holding.

## FACTS

{¶ 2} On June 17, 2012, Debra Rednour, a 9–1–1 operator for the Butler County Sheriff's Office, answered an incoming 9–1–1 call. An unidentified female caller stated that there had been an accident, that her husband was not breathing, and that she needed an ambulance. Rednour dispatched the St. Clair Township Fire Department and a sheriff's deputy to the address. Rednour also asked the caller several questions, but the caller abruptly hung up the phone without providing further information.

{¶ 3} Rednour immediately attempted a callback to the original number. The first call resulted in no answer, so Rednour tried again. This time, a man identifying himself as "Michael Ray" answered the phone. Rednour told Ray that she was with the Butler County Sheriff's Office and that help was on the way. Ray replied, "I'm a murderer, and you need to arrest me." Rednour asked him what had happened. Ray stated, "I was caught drinking my dad's alcohol" and "He came in and got mad at me, and I just snapped and stabbed him." Rednour then proceeded to ask Ray a series of questions, including "where did you stab him?"; "[w]here is the knife?"; "was this just a regular kitchen knife[?]"; "[i]s your dad breathing?"; "[w]here is your dad right now?"; "[c]an you see if he's breathing?"; and "is the knife still in his chest?"

{¶ 4} That same day, Sheila McLaughlin, a reporter from the Enquirer, submitted a public-records request to the Butler County Sheriff's Office for 9–1–1 calls. The sheriff provided McLaughlin with a copy of the incoming 9–1–1 call that Rednour had received. McLaughlin then submitted a second request for the two return calls that Rednour had placed. Appellant/cross-appellee Butler County Prosecuting Attorney Michael Gmoser responded, denying McLaughlin's request. Gmoser claimed that the return calls were both trial-preparation records under R.C. 149.43(A)(1)(g) and confidential law-enforcement investigatory records under R.C. 143.43(A)(1)(h) and thus were exempt from the public-records laws.

{¶ 5} On June 21, 2012, the Enquirer reiterated its request for recordings of Rednour's two outgoing calls. Gmoser again asserted that the recordings were not public records but nevertheless released the recording of the first outbound

call that had resulted in no answer. Gmoser then filed a motion for a protective order with appellant/cross-appellee Judge Michael J. Sage, who had just been assigned to handle Ray's then-pending murder trial. In the motion, Gmoser asked the trial court to issue an order precluding dissemination of the second return call.

{¶ 6} On June 25, 2012, Judge Sage conducted a hearing on the motion. He listened to the recording in camera and heard arguments from Gmoser, Ray's counsel, and counsel for the Enquirer and another news organization. Judge Sage granted the motion and issued a protective order prohibiting public dissemination of the call.

{¶ 7} Within days of the ruling, the Enquirer filed a complaint in the Twelfth District Court of Appeals. The Enquirer sought a writ of mandamus ordering Gmoser to release the recording. It also sought a writ of prohibition precluding Judge Sage from enforcing the protective order. The Enquirer also asked for attorney fees and statutory damages.

{¶ 8} On October 11, 2012, four days before Ray's criminal trial was to begin, Judge Sage amended the protective order, permitting the dissemination of the recording to the media immediately before its admission into evidence. Gmoser released the recording on the day of trial.

{¶ 9} Following release of the recording, Judge Sage and Gmoser filed a motion to dismiss the Enquirer's mandamus complaint as moot. The Twelfth District overruled the motion.[1] After briefing and oral argument, the court granted the writ of mandamus, denied the writ of prohibition, denied attorney fees, and awarded statutory damages. Judge Sage and Gmoser appealed, and the Enquirer cross-appealed.

## ANALYSIS

### Writ of Mandamus

{¶ 10} "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act." *State ex rel. Physicians Commt. for Respon-*

---

1. Neither party discusses the mootness issue here, but we note our agreement with the court of appeals. In general, the provision of requested records to a relator in a public-records case renders the mandamus claim moot. *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Info. Network, Inc. v. Dupuis,* 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 8. A claim is not moot, however, "if it is capable of repetition, yet evading review." *State ex rel. Dispatch Printing Co. v. Geer,* 114 Ohio St.3d 511, 2007-Ohio-4643, 873 N.E.2d 314, ¶ 10. This exception "applies only in exceptional circumstances in which the following two factors are both present: (1) the challenged action is too short in its duration to be fully litigated before its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *State ex rel. Calvary v. Upper Arlington,* 89 Ohio St.3d 229, 231, 729 N.E.2d 1182 (2000). Because both factors are present here, this case is not moot.

*sible Medicine v. Ohio State Univ. Bd. of Trustees,* 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6; *see also* R.C. 149.43(C)(1). Thus, mandamus is the appropriate cause of action for the Enquirer to bring here. To be entitled to a writ of mandamus, the Enquirer must establish a clear legal right to the requested relief and a clear legal duty on the part of Gmoser to provide the relief. *State ex rel. Waters v. Spaeth,* 131 Ohio St.3d 55, 2012-Ohio-69, 960 N.E.2d 452, ¶ 6. The Enquirer must prove that it is entitled to the writ by clear and convincing evidence. *Id.* at ¶ 13.

### The 9–1–1 Return Call Is a Public Record

{¶ 11} A "public record" is any record "kept by any public office, including, but not limited to, state, county, city, village, township, and school district units." R.C. 149.43(A)(1). The return call clearly meets the threshold definition of "public record" under R.C. 149.43; it is a record kept by Butler County, which qualifies as a public office under the Public Records Act. R.C. 149.011(A) and (G). Therefore, for Gmoser to withhold the recording from the Enquirer, the recording must fit within a statutory exception.

{¶ 12} Gmoser asserts that the return call falls under three exceptions. He argues that it constitutes a "[t]rial preparation record" under R.C. 149.43(A)(1)(g), a "confidential law enforcement investigatory record" under R.C. 149.43(A)(1)(h), and a "[r]ecord[ ] the release of which is prohibited by state or federal law" under R.C. 149.43(A)(1)(v). We find no merit to these claims.

### The Recording Is Not an Exempt Trial–Preparation Record

{¶ 13} First, the recording of the phone call is not a trial-preparation record. R.C. 149.43(A)(4) defines "trial preparation record" as "any record that contains information that is specifically compiled in reasonable anticipation of, or in defense of, a civil or criminal action or proceeding, including the independent thought processes and personal trial preparation of an attorney." The recorded call does not meet this definition because it was not "specifically compiled in reasonable anticipation of * * * [a] criminal action or proceeding." R.C. 149.43(A)(4). Rednour testified that when she placed the return call, she had no reason to believe that a crime had taken place. Indeed, the caller had described the incident as an accident. Rednour further testified that the entire purpose of the callback and her questions to Ray was to assist the first responders and the victim, not to investigate a potential crime.

{¶ 14} Even if we ignored Rednour's explicit testimony and generously agreed with appellants that Rednour's call may have had dual purposes, the call would still fall outside the definition of a "trial preparation record." As we have held, "when an investigation has multiple purposes, the records of that investigation cannot be said to be trial preparation records." *Franklin Cty. Sheriff's Dept. v.*

*State Emp. Relations Bd.,* 63 Ohio St.3d 498, 502, 589 N.E.2d 24 (1992). Even general fact-finding investigations do not produce trial-preparation records, as "such investigations do not meet the 'specifically compiled' requirement of the statute." *State ex rel. Coleman v. Cincinnati,* 57 Ohio St.3d 83, 84, 566 N.E.2d 151 (1991), quoting R.C. 149.43(A)(4).

{¶ 15} Appellants also argue that the recording must be a trial-preparation record because it eventually became a part of the prosecution's file. This court has explicitly rejected that argument before, holding that "[n]ot every record contained within a prosecutor's file is an exempt 'trial preparation record.'" *State ex rel. Carpenter v. Tubbs Jones,* 72 Ohio St.3d 579, 580, 651 N.E.2d 993 (1995); *see also State ex rel. Cincinnati Enquirer v. Hamilton Cty.,* 75 Ohio St.3d 374, 378, 662 N.E.2d 334 (1996) ("the fact that the tapes in question subsequently came into the possession and/or control of a prosecutor, [or] other law enforcement officials * * * has no significance [to their public-records status]").

{¶ 16} Here, the recording is not a trial-preparation record, because Rednour did not place the return call or question Ray for the specific purpose of preparing for a criminal proceeding. And the recording could not suddenly transform into a trial-preparation record simply because it moved from Rednour's office to the prosecutor's file. *See Carpenter* at 580 ("non-exempt records do not become 'trial preparation records' simply because they are contained within a prosecutor's file"). Simply put, the record here fails to show that Rednour was even thinking about criminal investigation, let alone that she was specifically compiling information for trial. Accordingly, the recording does not fall under the exemption for trial-preparation records contained in R.C. 149.43(A)(4).

### The Recording Is Not an Exempt Confidential Law–Enforcement Investigatory Record

{¶ 17} We similarly reject appellants' argument that the return call qualifies as an exempt "[c]onfidential law enforcement investigatory record." R.C. 149.43(A)(1)(h). A "confidential law enforcement investigatory record" is

> any record that pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:
>
> (a) The identity of a suspect who has not been charged with the offense to which the record pertains, or of an information source or witness to whom confidentiality has been reasonably promised;

(b) Information provided by an information source or witness to whom confidentiality has been reasonably promised, which information would reasonably tend to disclose the source's or witness's identity;

(c) Specific confidential investigatory techniques or procedures or specific investigatory work product;

(d) Information that would endanger the life or physical safety of law enforcement personnel, a crime victim, a witness, or a confidential information source.

R.C. 149.43(A)(2). Appellants claim that disclosure of the recording would mean disclosure of "specific investigatory work product" under subsection (A)(2)(c) of the statute. Beyond this bare assertion, though, appellants make no attempt to explain how the recording at issue actually constitutes law-enforcement investigatory work product. And we can find no justification ourselves.

{¶ 18} Under R.C. 149.43(A)(2)(c), "work product" means notes, working papers, memoranda, or similar materials prepared by law-enforcement officials in anticipation of litigation. *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 434, 639 N.E.2d 83 (1994), citing *Black's Law Dictionary* 1606 (6th Ed.Rev.1990). Rednour's phone call plainly does not meet this definition. First, Rednour is not a law-enforcement official. Second, Rednour was not questioning Ray in anticipation of future litigation. Her sole purpose was to protect the first responders and the victim. She testified that she did not place the return call at the request of the prosecutor's office or the sheriff's office; she placed it as part of her routine duties. She has never had any training in, and has never been involved in, criminal investigations. She further confirmed that she did not "initiate any type of criminal investigation" during the callback. Accordingly, we find no merit to appellants' assertion that the recording constitutes an exempt confidential law-enforcement investigatory record under R.C. 149.43(A)(2)(c).

*The Recording Is Not Exempt as a Record Whose Release*
*Is Prohibited by State or Federal Law*

**The Constitution Does Not Prohibit Release of the Record**

{¶ 19} Finally, appellants argue that the recording is exempt under R.C. 149.43(A)(1)(v) because it is a "[r]ecord[ ] the release of which is prohibited by state or federal law." First, appellants claim that the United States Constitution prohibits release of the recording. They argue that public dissemination of the tape would create extensive, negative pretrial publicity that would prejudice Ray's Sixth Amendment right to a fair trial.

{¶ 20} Appellants' concerns are certainly valid. We have previously recognized that where the release of a record "would prejudice the defendant's rights under

the state and federal Constitutions, the information at issue would constitute 'records the release of which is prohibited by state or federal law.' " *State ex rel. Vindicator Printing Co. v. Watkins,* 66 Ohio St.3d 129, 138, 609 N.E.2d 551 (1993). Specifically, where "release of the records would prejudice the right of a criminal defendant to a fair trial, such information would be exempt from disclosure pursuant to R.C. 149.43(A)(1) during the pendency of the defendant's criminal proceeding." *Id.*

{¶ 21} Yet in evaluating the constitutionality of the record's release, the parties do not focus solely on the Sixth Amendment. The Enquirer counters that we must also consider the First Amendment. Because of the "right of access" that applies to criminal proceedings, the Enquirer believes it has a countervailing constitutional claim to the recording. *See State ex rel. Beacon Journal Publishing Co. v. Bond,* 98 Ohio St.3d 146, 2002-Ohio-7117, 781 N.E.2d 180, ¶ 15–16. The parties therefore contend that in order to determine whether the Constitution prohibits release of the phone call, we must use the balancing test set forth in *Press–Ent. Co. v. Superior Court of California for Riverside Cty.,* 478 U.S. 1, 14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), and adopted by this court in *Bond.* Under *Press–Ent.,* a defendant's Sixth Amendment rights will trump the media's First Amendment rights, allowing a court to seal certain materials or proceedings, only if "there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Id.* at 14. Both appellants and appellee proceed as if *Press–Ent.* governs our inquiry. We are not convinced.

{¶ 22} The First Amendment guarantees the press a "right of access to criminal proceedings that have ' "historically been open to the press and general public" and in which "public access plays a significant positive role in the functioning of the particular process in question." ' " *Bond* at ¶ 15, quoting *In re T.R.,* 52 Ohio St.3d 6, 12, 556 N.E.2d 439 (1990), quoting *Press–Ent.* at 8. Here, the Enquirer was not seeking access to a historically public proceeding. It was asking to examine a physical piece of evidence in the prosecution's file, even before that evidence became part of any criminal proceedings. The First Amendment does not give the Enquirer the right to open the prosecution's evidence locker. *See, e.g., Houchins v. KQED, Inc.,* 438 U.S. 1, 9, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) ("This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control"); *Crowe v. San Diego Cty.,* 210 F.Supp.2d 1189, 1195 (S.D.Cal.2002), quoting *Times Mirror Co. v. United States,* 873 F.2d 1210, 1213–1214 (9th Cir.1989) (there is "no 'historical tradition of public access' to criminal investigations"). Indeed, even evidence exchanged during pretrial discovery falls outside the First Amendment right of access. *Seattle Times Co. v. Rhinehart,* 467 U.S.

20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *see also United States v. Smith,* 985 F.Supp.2d 506 (S.D.N.Y.2013) ("there is no right of access to discovery materials"); *United States v. Kravetz,* 706 F.3d 47, 54 (1st Cir.2013) ("there is no tradition of access to criminal discovery").

{¶ 23} So, at the time the Enquirer made its public-records request, it had no First Amendment claim to the recording, and the *Press–Ent.* balancing test is inapplicable. Instead, the only question we must ask is whether pretrial disclosure of the recording would have prejudiced Ray's Sixth Amendment rights.

{¶ 24} In determining whether pretrial release of information to the media will violate a defendant's Sixth Amendment rights, judges must (1) "assess the probable publicity that would [arise] prior to the time a jury was selected," (2) "examine the probable nature of the publicity," and (3) "determine how it would affect prospective jurors." *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). We are unable to make these assessments in this case. As the court of appeals correctly noted, there is nothing in the record regarding whether publicity might result, the probable extent of that publicity, the nature of that publicity, or how that publicity would affect the jury pool. 2013-Ohio-2270, 992 N.E.2d 1178, ¶ 28–30.

{¶ 25} All we have before us is the recording itself. And while we can certainly agree that the recording contains prejudicial information, that fact alone is insufficient for us to predict a Sixth Amendment violation. We still need to know whether this prejudicial information would create extensive publicity and whether this publicity would be so pervasive and negative that it would prevent Ray from finding 12 impartial jurors. *See Nebraska Press.* We cannot assume or speculate our way to these necessary findings; there must be some evidence in the record that speaks to the possible publicity and its effect on the jury pool. *See State ex rel. Toledo Blade Co. v. Henry Cty. Court of Common Pleas,* 125 Ohio St.3d 149, 2010-Ohio-1533, 926 N.E.2d 634, ¶ 36, quoting *State ex rel. Chillicothe Gazette, Inc. v. Ross Cty. Court of Common Pleas,* 2 Ohio St.3d 24, 25, 442 N.E.2d 747 (1982), quoting *State ex rel. Dayton Newspapers, Inc. v. Phillips,* 46 Ohio St.2d 457, 468–469, 351 N.E.2d 127 (1976) ("In the absence of any properly introduced evidence, ' "there is no reason for a trial court to * * * [conclude] that there will be prejudicial publicity * * * and to presume that such publicity will create a * * * threat to the administration of justice * * * " ' "); *see also Nebraska Press* at 565 ("pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial"). Unfortunately, appellants have failed to provide us with any such evidence.

{¶ 26} We are therefore unable to conclude that pretrial release of the recording would have prejudiced Ray's Sixth Amendment rights.

### Crim.R. 16(C) Does Not Prohibit Release of the Record

{¶ 27} Second, appellants argue that the recording is exempt under R.C. 149.43(A)(1)(v) because its release would violate Crim.R. 16(C). Crim.R. 16(C) provides:

> The prosecuting attorney may designate any material subject to disclosure under this rule as "counsel only" by stamping a prominent notice on each page or thing so designated. * * * Except as otherwise provided, "counsel only" material may not be shown to the defendant or any other person, but may be disclosed only to defense counsel, * * * and may not otherwise be reproduced, copied or disseminated in any way.

Appellants claim that Crim.R. 16(C) is a state law that prohibits the dissemination of Rednour's recording, thereby exempting it from the Public Records Act. *See* R.C. 149.43(A)(1)(v).

{¶ 28} We summarily reject this argument on two grounds. First, appellants did not raise this claim in the court below, so they have waived it. More importantly, though, there is nothing in the record demonstrating that Gmoser ever designated the recording as "counsel only." Consequently, he cannot claim that such a designation would save the recording from public-records disclosure.

{¶ 29} Accordingly, we reject appellants' claim that the recording is not a public record under R.C. 149.43(A)(1)(v). They have not shown that release of the recording would violate either the Constitution or state law.

{¶ 30} Having rejected all of appellants' arguments, we conclude that the recorded phone call is a public record not subject to any exemption under R.C. 149.43. Given this conclusion, we need not address the question whether Rednour's outgoing call is functionally equivalent to the types of incoming 9–1–1 calls we have considered in prior cases. *See Hamilton Cty.*, 75 Ohio St.3d 374, 662 N.E.2d 334. Regardless of what we term the recording—a 9–1–1 call or something different—it is still a public record in its own right. On these grounds, we affirm the court of appeals' decision to grant the Enquirer a writ of mandamus ordering Gmoser to release the recording.

### *Writ of Prohibition*

{¶ 31} The Enquirer also requested a writ of prohibition preventing Judge Sage from enforcing the protective order he entered in Ray's criminal case. The Enquirer argued that the protective order has "no force of law" because Judge Sage did not have legal authority to issue the order in the first place.

{¶ 32} We need not address the merits of the Enquirer's prohibition claim. The prohibition action asks us to find the protective order unenforceable. But the writ of mandamus we affirmed above already renders the protective order unenforceable. *See Bond,* 98 Ohio St.3d 146, 2002-Ohio-7117, 781 N.E.2d 180, at ¶ 49–50 (a writ of mandamus compelling the release of a public record is sufficient to invalidate a contrary protective order in an underlying criminal case). Resolution of the prohibition question is therefore unnecessary; we need not consider all the myriad ways of invalidating an already invalidated order. *See State ex rel. Asti v. Ohio Dept. of Youth Servs.,* 107 Ohio St.3d 262, 2005-Ohio-6432, 838 N.E.2d 658, ¶ 34, quoting *PDK Laboratories, Inc. v. United States Drug Enforcement Administration* (D.C.Cir.2004), 362 F.3d 786, 799 (Roberts, J., concurring in part and in the judgment) (" 'if it is not necessary to decide more, it is necessary not to decide more' ").

{¶ 33} The court of appeals nevertheless took the opposite approach from ours: it granted the writ of mandamus but then still proceeded to analyze the prohibition claim. This analysis and resolution was unnecessary. We therefore vacate the court of appeals' decision insofar as it expressed an opinion on the writ of prohibition. That portion of the court's decision is without precedential value.

### *Attorney Fees and Statutory Damages*

{¶ 34} Finally, we consider the Enquirer's requests for attorney fees and statutory damages.

### *Attorney Fees*

{¶ 35} The court of appeals denied the Enquirer's request for attorney fees. We review the court's decision for an abuse of discretion. *State ex rel. Doe v. Smith,* 123 Ohio St.3d 44, 2009-Ohio-4149, 914 N.E.2d 159, ¶ 15. "An abuse of discretion means an unreasonable, arbitrary, or unconscionable action." *State ex rel. Beacon Journal Publishing Co. v. Akron,* 104 Ohio St.3d 399, 2004-Ohio-6557, 819 N.E.2d 1087, ¶ 59.

{¶ 36} Here, the court of appeals reasoned that attorney fees were unwarranted because Gmoser, though he lacked legal justification, still acted reasonably and "in good faith" when withholding the record. 2013-Ohio-2270, 992 N.E.2d 1178, ¶ 54. The court also concluded that there was little, if any, public benefit in releasing the record. *Id.* at ¶ 56. Our precedent explicitly approves use of all these considerations—reasonableness, good faith, and public benefit—in a court's attorney-fee determination. *See, e.g., Doe* at ¶ 34–39.

{¶ 37} The Enquirer nevertheless contends that a good-faith standard is inappropriate and that R.C. 149.43(C)(2)(c) supplies the exclusive standard for attorney-fee determinations. On this point, the Enquirer is mistaken. R.C. 149.43(C)(2)(c) lists two factors that permit a court to either reduce or eliminate

an award of attorney fees. These factors, however, come into play only after a court has already made the determination to award fees in the first place. *See Doe* at ¶ 33. As we explained in *Doe*:

> Appellant * * * asserts that insofar as an attorney-fee award under R.C. 149.43 is discretionary, courts can consider only the factors specified in R.C. 149.43(C)(2)(c)(i) and (ii) to reduce or deny an award. * * * [A]ppellant misreads the plain language of the statute. Under R.C. 149.43(C)(2)(b), courts in public-records cases "*may* award reasonable attorney's fees subject to reduction as described in division (C)(2)(c)." (Emphasis added.) The factors specified in R.C. 149.43(C)(2)(c)(i) and (ii) are considered after a court makes an initial, tentative decision to award fees.

*Id.*, quoting R.C. 149.43(C)(2)(c). The Enquirer is therefore incorrect in its assertion that R.C. 149.43(C)(2)(c) provides the sole factors a court may consider when initially deciding whether to award attorney fees.

{¶ 38} Nevertheless, while we approve of the court's enumerated considerations, we find the court's ultimate conclusions to be unreasonable in light of the record before us.

{¶ 39} This saga began with a simple request for recordings of 9–1–1 calls. The prosecutor's office denied the Enquirer's initial request without giving any explanation or citing any legal authority. It then denied the Enquirer's follow-up request for outgoing calls from the 9–1–1 operator. The denial letter cited two legal bases for withholding the records: R.C. 149.43(A)(1)(g) (the exemption for trial-preparation records) and 149.43(A)(1)(h) (the exemption for confidential law-enforcement investigatory records). Neither has merit, as we detailed above.

{¶ 40} Rather than rest on its denial and wait for the Enquirer to commence a mandamus action, the office went on the offensive, seeking a protective order from the trial judge in Ray's underlying criminal case. This forced the Enquirer into a two-front war: it now had to both prosecute its own mandamus case and defend against the protective order.

{¶ 41} The protective order had no place in this public-records dispute. Mandamus actions resolve public-records matters; criminal-trial motions do not. *See Bond*, 98 Ohio St.3d 146, 2002-Ohio-7117, 781 N.E.2d 180, at ¶ 49–50. Thus, the protective order only served to saddle the Enquirer with more litigation and more attorney fees. These tactics do not demonstrate good faith by the prosecutor's office, and the court of appeals was unreasonable in concluding otherwise. The office forced the Enquirer to incur additional legal fees. It should be responsible, in some measure, for the extra costs that it created.

{¶ 42} We also disagree with the court of appeals' conclusion that release of the record would not confer a significant public benefit. The Enquirer "publishes a newspaper and securing this record enables it to provide 'complete and accurate news reports * * * to the public.'" *State ex rel. Beacon Journal Publishing Co. v. Maurer*, 91 Ohio St.3d 54, 58, 741 N.E.2d 511 (2001), quoting *State ex rel. Multimedia, Inc. v. Whalen*, 51 Ohio St.3d 99, 100, 554 N.E.2d 1321 (1990). A free and informed press enables a free and informed public. Here, as in *Maurer* and *Whalen*, "the public benefit is manifest." *Whalen* at 100.

{¶ 43} In light of the record and our precedent, we conclude that the court of appeals abused its discretion in denying the Enquirer attorney fees. The prosecutor's office lacked legal authority for withholding the records, it drove up the Enquirer's burdens and costs by dragging the Enquirer into Ray's criminal case, and it stymied a significant public benefit in the process. We therefore reverse the court of appeals on this issue and remand for a proper determination of attorney fees.

### Statutory Damages

{¶ 44} The court of appeals awarded the Enquirer $1,000 in statutory damages, the maximum allowable amount. R.C. 149.43(C)(1). Appellants argue that the court should not have awarded any statutory damages at all. Again, we review the court's decision for an abuse of discretion. *See State ex rel. Patton v. Rhodes*, 129 Ohio St.3d 182, 2011-Ohio-3093, 950 N.E.2d 965, ¶ 12.

{¶ 45} R.C. 149.43(C)(1) controls damages awards in public-records cases. It provides:

> [T]he requestor shall be entitled to recover the amount of statutory damages set forth in this division if a court determines that the public office or the person responsible for public records failed to comply with an obligation in accordance with division (B) of this section.

R.C. 149.43(C)(1).

{¶ 46} Here, the court of appeals correctly found that Gmoser withheld the recording "without a proper legal justification." 2013-Ohio-2270, 992 N.E.2d 1178, at ¶ 57. Gmoser had a duty to release the public record, and he did not comply with this obligation. Statutory damages were appropriate, and the court of appeals did not abuse its discretion in awarding them.

### CONCLUSION

{¶ 47} The outgoing 9-1-1 call at issue is a public record. The evidence establishes that the call is not exempt from release as either a trial-preparation

record or a confidential law-enforcement investigatory record. Appellants have also failed to show that release of the record would violate the Constitution or state law. The Enquirer was therefore entitled to a writ of mandamus ordering release of the record. We affirm the court of appeals' decision in this regard.

{¶ 48} We do not address the merits of the Enquirer's request for a writ of prohibition or review the propriety of Judge Sage's protective order. The writ of mandamus already forces release of the record and invalidates the protective order, regardless of the order's underlying legality. We therefore vacate the portion of the court of appeals' decision addressing the writ of prohibition.

{¶ 49} And while we affirm the court of appeals' decision to grant statutory damages, we reverse the court's denial of attorney fees. We remand this matter to the court of appeals so that it may hear evidence and make an appropriate award of attorney fees.

Judgment affirmed in part,<br>
vacated in part,<br>
reversed in part<br>
and cause remanded.

O'Donnell, Kennedy, and O'Neill, JJ., concur.

O'Connor, C.J., and Lanzinger, J., concur in judgment only.

Pfeifer, J., dissents.

---

**Pfeifer, J., dissenting.**

{¶ 50} "[O]ur printers raven on the agonies of their victims, as wolves do on the blood of the lamb." Thomas Jefferson, Letter to James Monroe, May 5, 1811, available at http://founders.archives.gov/doc1fuments/Jefferson/03-03-02-0479.

{¶ 51} I have written previously on the topic of 9-1-1 calls as public records that "[t]he public's right to scrutinize the workings of the government should be balanced against an individual citizen's right to privacy. A person should be able to summon the help of police officers or firefighters without having his plea broadcast on the evening news." *State ex rel. Dispatch Printing Co. v. Morrow Cty. Prosecutor's Office*, 105 Ohio St.3d 172, 2005-Ohio-685, 824 N.E.2d 64, ¶ 20 (Pfeifer, J., concurring). I have attempted to make the case that citizens should be free from having to publicize their greatest personal tragedies in order to gain the benefit of emergency services their government provides, but I have also recognized that addressing that concern is an issue for the General Assembly. *Id.; see also State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 381, 662 N.E.2d 334 (1996) (Pfeifer, J., concurring).

{¶ 52} But this case is different. Here, two specific statutory provisions exempt the call in question in this case from the definition of "public record." First, pursuant to R.C. 149.43(A)(1)(g), the recording of the call does not constitute a public record because it is a trial-preparation record. Second, a recording of the call is not a public record pursuant to R.C. 149.43(A)(1)(v), because the release of it is "prohibited by state or federal law." Specifically, the pretrial release of the recording would have violated the defendant's Sixth Amendment right to a fair trial. Because I would find that the recording of the call in question was not a public record, I dissent.

## I

{¶ 53} The first words Michael Ray heard after he answered the callback call from the 9–1–1 operator, Debra Rednour, were "Okay, I have help on the way. This is the Butler County Sheriff's Office. I need to know what's going on." Ray immediately responded, "I'm a murderer, and you need to arrest me."

{¶ 54} This was not simply a continuation of the earlier 9–1–1 call. Ray was not a part of the original 9–1–1 call. He did not voluntarily begin a 9–1–1 call. Instead, he answered a call to his home and was told that the caller was from the Butler County sheriff's office and that he needed to tell the caller what was going on.

{¶ 55} Here is the way this court described the 9–1–1 calls in *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d at 377–378, 662 N.E.2d 334:

> Basic 911 systems, including the ones used by [the Hamilton County Communications Center ("HCCC")] and [the Cincinnati Police Communications Center ("CPCC")], are systems "in which a *caller* provides information on the nature of and location of an emergency, and the personnel receiving the call must determine the appropriate emergency service provider to respond at that location." R.C. 4931.40(B). For example, HCCC automatically records 911 calls, which do not include the personal opinions of its employees. HCCC employees do not act under the direction of the county prosecutor or law enforcement officials when receiving and responding to 911 calls. *HCCC employees are not employees of any law enforcement agency and are not trained in criminal investigation.* The HCCC 911 operators simply compile information and do not investigate. The 911 tapes are not made in order to preserve evidence for criminal prosecution. *Nine-one-one calls that are received by HCCC are always initiated by the callers.* According to CPCC Senior Police Sergeant Schrand, a 911 call involving criminal conduct is essential-

ly a citizen's initial report of the criminal incident, which could typically trigger a police investigation.

(Emphasis added.)

{¶ 56} The call in this case differs in several important regards from the description in *Hamilton Cty.* of what constitutes a 9–1–1 call. Ray was not the caller, the 9–1–1 operator initiated the call in question to investigate a 9–1–1 call she had received from a different person, and the operator was an employee of the sheriff's office.

{¶ 57} Further, the call in question does not fit within 9–1–1–related definitions in the Revised Code. R.C. 128.01(A) defines a "9–1–1 system" as "a system through which individuals can request emergency service using the telephone number 9–1–1." In R.C. 128.01(B), a "Basic 9–1–1" system is defined as one "in which the caller provides information on the nature of and the location of an emergency, and the personnel receiving the call must determine the appropriate emergency service provider to respond at that location." Again, Ray was not the caller in this case. He initiated no request for emergency service.

{¶ 58} The call in question was not a 9–1–1 call as defined by the General Assembly or as described by this court in *Hamilton Cty.* The court below held that this court's determination in *Hamilton Cty.* that 9–1–1 calls do not qualify as trial-preparation records or confidential law-enforcement investigatory records under R.C. 149.43 meant that the call in this case could not meet either of those exceptions. 2013-Ohio-2270, 992 N.E.2d 1178, ¶ 22.

{¶ 59} But since the call at issue was not a 9–1–1 call, the record of the call could fall under a statutory exception to the public-records law. The majority seems to recognize this also, as it ignores the issue whether the call in question was a 9–1–1 call and addresses whether the call constitutes a trial-preparation record under R.C. 149.43(A)(1)(g) or a confidential law-enforcement investigatory record under R.C. 149.43(A)(1)(h). I would hold that the recording of the call constitutes a trial-preparation record.

{¶ 60} A trial-preparation record is "any record that contains information that is specifically compiled in reasonable anticipation of, or in defense of, a civil or criminal proceeding, including the independent thought processes and personal trial preparation of an attorney." R.C. 149.43(A)(4). The recording of the call in question assuredly contained information that was specifically compiled in reasonable anticipation of a criminal proceeding. Once Michael Ray declared, "I'm a murderer, and you need to arrest me," there could be no doubt in the operator's mind that the recording would be the key piece of evidence in a criminal proceeding against Ray. Rednour, a sheriff's department employee, calmly got Ray to state his name, the basics of what had happened, including why he had

stabbed his stepfather, where he had stabbed his stepfather, and finally, the location of the murder weapon. These were statements describing past events that established Ray's role as his stepfather's killer. Rednour sought out information from Ray not specifically related to the medical condition of the victim.

{¶ 61} In *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the United States Supreme Court considered whether information provided to a 9–1–1 operator from a domestic-violence victim (as in this case, the call was a callback from the operator following a hang-up on the original 9–1–1 call) was testimonial. In making that determination, the court recognized that the inquiries of a police operator in the course of a 9–1–1 call can constitute an interrogation. *Id.* at 823. Rednour, a sheriff's office employee, conducted a skilled interrogation of Ray. The record of this call identifies the killer, the killer's motive, and the murder weapon, and all of that information followed questioning by Rednour. I would hold that the information gleaned from the call in question was specifically compiled in reasonable anticipation of a criminal proceeding. Thus, I would hold that pursuant to R.C. 149.43(A)(1)(g) and (A)(4), the recording of the call is not a public record.

## II

{¶ 62} R.C. 149.43(A)(1)(v) excludes from the definition of "public record" "[r]ecords the release of which is prohibited by state or federal law." The majority acknowledges that "where 'release of the records would prejudice the right of a criminal defendant to a fair trial, such information would be exempt from disclosure pursuant to R.C. 149.43(A)(1) during the pendency of the defendant's criminal proceeding.'" Majority opinion at ¶ 20, quoting *State ex rel. Vindicator Printing Co. v. Watkins*, 66 Ohio St.3d 129, 138, 609 N.E.2d 551 (1993). Significantly, the majority also acknowledges that the Enquirer had no countervailing First Amendment right to the 9–1–1 call that would require a balancing of the two rights by the trial court. The majority writes:

> Here, the Enquirer was not seeking access to a historically public proceeding. It was asking to examine a physical piece of evidence in the prosecution's file, even before that evidence became part of any criminal proceedings. The First Amendment does not give the Enquirer the right to open the prosecution's evidence locker. * * *
>
> So, at the time the Enquirer made its public-records request, it had no First Amendment claim to the recording, and the *Press–Ent. [Co. v. Superior Court of California for Riverside Cty.*, 478 U.S. 1, 14, 106 S.Ct.

2735, 92 L.Ed.2d 1 (1986) ] balancing test is inapplicable. Instead, the only question we must ask is whether pretrial disclosure of the recording would have prejudiced Ray's Sixth Amendment rights.

Majority opinion at ¶ 22.

{¶ 63} But although the majority concludes that the First Amendment is not in play in this case, it relies on cases in which First Amendment concerns *were* at issue in concluding that there are insufficient facts in the record to find that the defendant's Sixth Amendment right to a fair trial would be jeopardized by the pretrial release of the 9–1–1 return call.

{¶ 64} *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), concerned prior restraint of the press, as a trial court prohibited reporting on certain information revealed during court hearings regarding a multiple-murder case in a small Nebraska town. The three-part test from *Nebraska Press* relied on by the majority was part of a larger test balancing the rights of the accused with the freedom of the press. The majority writes:

> In determining whether pretrial release of information to the media will violate a defendant's Sixth Amendment rights, judges must (1) "assess the probable publicity that would [arise] prior to the time a jury was selected," (2) "examine the probable nature of the publicity," and (3) "determine how it would affect prospective jurors." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

Majority opinion at ¶ 24. In applying those factors in *Nebraska Press*, the United States Supreme Court concluded that the trial judge had reasonably concluded that the defendant's right to a fair trial would be jeopardized by pretrial publicity and recognized that making such a determination is inherently speculative:

> Our review of the pretrial record persuades us that the trial judge was justified in concluding that there would be intense and pervasive pretrial publicity concerning this case. He could also reasonably conclude, based on common man experience, that publicity might impair the defendant's right to a fair trial. He did not purport to say more, for he found only "a clear and present danger that pre-trial publicity *could* impinge upon the defendant's right to a fair trial." (Emphasis added.) His conclusion as to the impact of such publicity on prospective jurors was of necessity speculative, dealing as he was with factors unknown and unknowable.

*Nebraska Press Assn. v. Stuart,* 427 U.S. at 562–563, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 65} In *Nebraska Press,* it was not a lack of evidence but rather First Amendment implications that led the court to conclude that the orders put into place by the trial judge were unlawful, that the high barriers to prior restraint of the press had not been overcome.

> The state trial judge in the case before us acted responsibly, out of a legitimate concern, in an effort to protect the defendant's right to a fair trial. What we must decide is not simply whether the Nebraska courts erred in seeing the possibility of real danger to the defendant's rights, but whether in the circumstances of this case the means employed were foreclosed by another provision of the Constitution.

*Id.* at 555–556.

{¶ 66} Like *Nebraska Press,* the other cases cited by the majority on the Sixth Amendment issue all involve instances of prior restraint of the press and attendant First Amendment implications.

{¶ 67} In *State ex rel. Toledo Blade Co. v. Henry Cty. Court of Common Pleas,* 125 Ohio St.3d 149, 2010-Ohio-1533, 926 N.E.2d 634, relator sought a writ of prohibition to prevent a common pleas court and its judge from enforcing a gag order prohibiting the media from reporting about the trial proceedings in one criminal case until a jury was impaneled in a separate criminal case. In *State ex rel. Chillicothe Gazette, Inc. v. Ross Cty. Court of Common Pleas,* 2 Ohio St.3d 24, 26, 442 N.E.2d 747 (1982), this court considered the trial court's order prohibiting the appellee from publishing information gathered in open court. In *State ex rel. Dayton Newspapers, Inc. v. Phillips,* 46 Ohio St.2d 457, 351 N.E.2d 127 (1976), this court granted a writ of prohibition to prevent the enforcement by a trial court of an order improperly excluding the public and members of the press from pretrial hearings on a motion to suppress evidence.

{¶ 68} Here, there are no First Amendment implications, and, as the majority states, the *Press–Ent.* test is not relevant here. The onerous requirement from *Press–Ent.* that there must be a "substantial probability" of prejudice to the defendant is thus absent from this case. The appellate court found fault with the evidence presented in the trial court:

> There was no testimony from psychologists, sociologists, communications experts, media experts, jury experts, experienced trial lawyers, former

judges, or others as to how pretrial disclosure of the Outbound Call recording would impact Ray's right to a fair trial.

2013-Ohio-2270, 992 N.E.2d 1178, ¶ 28. But the appellate court thought that it was applying a *Press–Ent.* balancing test. *Id.* at ¶ 26. It erred in applying that test.

{¶ 69} Here, the trial court heard a recording of a defendant describing himself as a murderer, admitting that he stabbed his stepfather, and saying that he did so because he had snapped. This court wrote in *Watkins* that "[w]here a[n] * * * *in camera* inspection reveals that release of the records would prejudice the right of a criminal defendant to a fair trial, such information would be exempt from disclosure pursuant to R.C. 149.43(A)(1) during the pendency of the defendant's criminal proceeding." *State ex rel. Vindicator Printing Co. v. Watkins,* 66 Ohio St.3d at 138, 609 N.E.2d 551. The trial judge here did more than simply review the tape in camera; he held a hearing at which both sides were able to argue their positions.

{¶ 70} The judgment the trial judge made in this case was another in the innumerable judgments a trial judge must make as part of his or her job. This case required no expert testimony. It required only a prosecutor trying to do the right thing and a trial judge who was willing, if necessary to preserve the Sixth Amendment rights of the defendant, to make a decision that would be unpopular with the local media. I would find that the trial judge appropriately attempted to preserve the defendant's Sixth Amendment right to a fair trial in this case, and I accordingly dissent.

---

Graydon, Head & Ritchey, L.L.P., and John C. Greiner, for appellee and cross-appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael A. Oster Jr. and Kimberly L. McManus, Assistant Prosecuting Attorneys, for appellants and cross-appellees.

Baker Hostetler, L.L.P., and David L. Marburger, urging reversal of the denial of the writ of prohibition for amicus curiae, Ohio Coalition for Open Government.