**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Summers v. Fox*, Slip Opinion No. 2020-Ohio-5585.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-5585

[THE STATE EX REL.] SUMMERS *v.* FOX, PROS. ATTY., ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Summers v. Fox*, Slip Opinion No. 2020-Ohio-5585.]**

*Mandamus—Public records—Father who requested public records was not acting as his inmate-son's designee—R.C. 149.43(B)(8)—Writ granted in part and denied in part.*

(No. 2018-0959—Submitted September 22, 2020—Decided December 10, 2020.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1} Relator, Charles A. Summers, seeks a writ of mandamus to compel the production of public records by respondents, Mercer County Prosecuting Attorney Matthew Fox and Mercer County Sheriff Jeff Grey (collectively, "the county"). We grant the writ in part and deny it in part.

{¶ 2} Also pending are three motions: (1) the county's motion for an order sealing its evidence, (2) the county's motion to seal its merit brief, and (3) a motion filed by the Ohio Prosecuting Attorneys Association ("OPAA") for leave to file an amicus brief. We grant the motions to seal and deny as moot the motion for leave to file.

## I. BACKGROUND

### A. The Mercer County prosecution

{¶ 3} In February 2013, a Mercer County grand jury returned a 47-count indictment against Christopher Summers, which included two counts of rape and more than 40 counts of felonious sexual battery. The alleged crimes occurred when Christopher was employed by the Fort Recovery School District.

{¶ 4} J.K. attended Fort Recovery High School, where Christopher was both her teacher and coach. In 2012, J.K. reported to law enforcement that Christopher had coerced her into a sexual relationship that had lasted more than two years.

{¶ 5} The state voluntarily dismissed the rape charges on the first day of trial. On the third day of trial, after J.K.'s testimony was nearly complete, Christopher entered a plea of guilty to eight counts of sexual battery in violation of R.C. 2907.03, which prohibits sexual conduct between a teacher or coach and a student who is enrolled at the school where the teacher is employed. He was sentenced to an aggregate prison term of 20 years. The court of appeals affirmed his conviction and sentence in October 2014. *State v. Summers*, 2014-Ohio-4538, 21 N.E.3d 632, ¶ 53 (3d Dist.).

### B. The Darke County prosecution

{¶ 6} In January 2013, Christopher was indicted on a single count of sexual battery against J.K. in Darke County. He was convicted and sentenced to one year in prison, to be served consecutively to his sentence in the Mercer County case.

{¶ 7} On October 19, 2018, Darke County Prosecutor R. Kelly Ormsby III received an e-mail from a woman named Joyce White, requesting "everything you have on Chris Summers." In December 2018, Ormsby provided White with all the documents in his possession relating to Christopher's prosecution in Darke County. The documents included what appears to be J.K.'s detailed account of Christopher's behavior, containing graphic sexual content.

### C. The "Justice for Chris" Facebook page

{¶ 8} Relator, Charles Summers, and Vicki Summers are Christopher's parents. In May 2015, they started a Facebook page called "Justice for Chris." The page states that it was created "with the hope that everyone who knows us will learn the whole truth behind what happened to our son."

{¶ 9} Charles and Vicki have used the page as a platform to attack officials connected with the case against Christopher, calling the detectives "bumbling fools" and the trial judge "a very vindictive and mean little man" and accusing county officials of prosecuting Christopher in order to cover up a larger rape scandal.

{¶ 10} But the primary target of the "Justice for Chris" site was J.K., who is described in posts as "sick minded and a huge liar," a "sociopathic liar," and in need of "a psychological exam." The posts routinely identified her by name. Charles and Vicki posted J.K.'s weight and photos of her eating, ostensibly to refute her claim that the stress of her experience with Christopher caused her to lose weight. They questioned how she could become engaged, married, and pregnant so soon after the events involving Christopher.

{¶ 11} In early postings, Charles and Vicki set out to prove that J.K. had lied in court, by comparing her trial testimony with that of other witnesses. They also insisted that Christopher should not have been prosecuted because J.K. had been a willing participant in the sexual relationship. They pointed to J.K.'s texts as

"irrefutable proof that the relationship was mutual and consensual," not a product of force or coercion.

{¶ 12} As they acquired documents related to the case, Charles and Vicki posted them online, along with their comments. In April 2018, they posted excerpts from J.K.'s written statement to the police, apparently the same one provided to White by Darke County, with a link to the full document. On January 21, 2018, they wrote that "[r]ecently, some of the interview videos have been posted on another website." They then reposted clips of police interviewing J.K., adding captions and summaries for each clip.

{¶ 13} In June 2019, Charles and Vicki were indicted in Celina Municipal Court for 62 counts of menacing by stalking, telecommunications harassment, and attempts to commit those offenses. On February 10, 2020, the municipal court stayed all proceedings in the case pending the resolution of related litigation between the parties.

### D. Charles's public-records requests

{¶ 14} On or about February 1, 2017, Charles sent a public-records request to the Mercer County Prosecutor's Office. He requested the following:

[1] Any and all video recordings of interviews with the accuser and any other witnesses that were interviewed in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[2] Any and all audio recordings of interviews or phone calls made with the accuser or potential witness [sic] in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[3] Any and all notes made by the prosecutor or [a] member of his staff or the sheriff's detectives during interviews with the

4

accuser or any potential witnesses in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[4] Any and all police reports filed by members of the Mercer County Sheriff's Dept in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[5] Recordings of any phone calls made to the sheriff's office or 911 from the mother of the accuser on or about November 5, 2012. Also any other recordings of phone calls to central dispatch or sheriff's office concerning the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[6] Copies of letters sent to potential defense witnesses by the prosecutor or any member of his staff in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[7] Any pictures or notes taken during the search of the home of Chris and Laurie Summers on or about November 6, 2012.

[8] Any correspondence between the prosecutor and/or members of his staff to the defense lawyers, Howell and Lammers in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[9] Any statements (written or recorded) made by the accuser [J.K.] to any member of the Sheriff's Dept or the Prosecutor's Office.

[10] Any statements (written or recorded) made by the accuser's mother [L.K.] or any member of the [K.] family.

{¶ 15} On March 6, 2017, he sent a similar public-records request to the Mercer County sheriff. He requested the following:

[1] Any and all video recordings of interviews with the accuser [J.K.] and any other witnesses that were interviewed in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[2] Any and all audio recordings of interviews or phone calls made with the accuser or potential witnesses in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[3] Any and all notes made by the sheriff's detectives during interviews with the accuser or any potential witnesses in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[4] Any and all police reports filed by members of the Mercer County Sheriff's Dept in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[5] Recordings of any phone calls made to the sheriff's office or 911 from the mother of the accuser on or about November 5, 2012. Also any and all other recordings of phone calls to central dispatch or sheriff's office concerning the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[6] Any pictures or notes taken during the search of the home of Chris and Laurie Summers on or about November 6, 2012.

[7] Any correspondence between members of the Mercer County Sheriff's Department to [sic] the Mercer County Prosecutor of member [sic] of his staff in the case of State of OH vs Christopher A. Summers 12-CRM-129 and 13-CRM 030.

[8] Any statements (written or recorded) made by the accuser [J.K.] to any member of the Sheriff's Department.

[9] Any statements (written or recorded) made by the accuser's mother [L.K.] or any member of the [K.] family.

{¶ 16} The county denied Charles's requests, offering multiple justifications. As an inmate, Christopher would have had to secure approval from the judge who sentenced him before he could demand records relating to his case. R.C. 149.43(B)(8). The county took the position that Charles, because he was Christopher's father, was subject to the same requirement. It also denied the requests as overbroad and subject to various privileges.

{¶ 17} On May 4, 2017, Charles sent a second request, in which he denied that he was acting as Christopher's designee. The county again rejected the requests, in a letter dated May 31, 2017.

## II. PROCEDURAL HISTORY

{¶ 18} On July 12, 2018, Charles commenced this action for a writ of mandamus. After court-ordered mediation, Fox provided some responsive records to Charles's counsel.

{¶ 19} On June 26, 2019, we granted an alternative writ of mandamus. 156 Ohio St.3d 1440, 2019-Ohio-2496, 125 N.E.3d 903. J.K. filed a motion for leave to intervene as a respondent, which we granted. 156 Ohio St.3d 1480, 2019-Ohio-3170, 128 N.E.3d 247.

{¶ 20} The county filed six volumes of evidence, which did not include copies of the records at issue in this case. It also filed a motion for leave to file portions of that evidence under seal and moved for leave to have its merit brief placed under seal. We also received three amicus briefs in support of the county, from (1) the National Crime Victim Law Institute, the Ohio Domestic Violence Network, and the Ohio Alliance to End Sexual Violence, (2) The Buckeye State Sheriffs' Association, and (3) the OPAA, which submitted its brief along with its motion for leave to file.

{¶ 21} The parties all requested oral argument, which we granted. 157 Ohio St.3d 1501, 2019-Ohio-4768, 134 N.E.3d 1225. We heard oral argument on April 8, 2020, after which we ordered Fox to submit the disputed records for inspection. Our order also commanded: "Respondent Fox shall * * * file with the court a document-by-document list of each document that he claims is privileged and/or subject to a statutory exception. The list shall include a detailed explanation of the reason(s) that each document is subject to privilege or a statutory exception." 158 Ohio St.3d 1462, 2020-Ohio-1424, 142 N.E.3d 684. On May 28, 2020, Fox complied with that order.

### III. LEGAL ANALYSIS

### A. Preliminary matters

{¶ 22} Before we reach the substance of Charles's public-records requests, we must address several preliminary issues.

{¶ 23} First, the OPAA filed a motion for leave to file an amicus brief in support of the county, along with a copy of the proposed brief. However, under our rules, "an amicus curiae may file a merit brief in an original action without leave of court." *State ex rel. Duke Energy Ohio, Inc. v. Hamilton Cty. Court of Common Pleas*, 126 Ohio St.3d 41, 2010-Ohio-2450, 930 N.E.2d 299, ¶ 11; *see also* S.Ct.Prac.R. 12.07(A) and 16.06(A). Because leave is not required, we deny the motion as moot.

{¶ 24} Second, when it filed its evidence, the county also filed a motion for leave to file the exhibits under seal. One month later, the county moved to have its merit brief placed under seal. The county asked to have specific items of evidence sealed, including the affidavits of J.K., Fox, and Sergeant Detective Megan Baker of the Mercer County Sheriff's Office, as well as copies of posts from the Justice for Chris Facebook page. We have reviewed the filings and find that much of the information they contain is personal and sensitive and pertains to people who did

8

not choose to file this lawsuit or place this information before the public. Moreover, Charles has not opposed the motions. We therefore grant them.

{¶ 25} Finally, several of Charles's public-records requests are no longer live controversies because the parties appear to agree that the county provided the responsive records during mediation. The county represents that these records include police reports (Charles's fourth request to both Fox and Grey), calls to 911 or the sheriff's office (Charles's fifth request to both Fox and Grey), notes and pictures taken during the search of Christopher's home (Charles's seventh request to Fox and sixth request to Grey), and statements made by the accuser's family (Charles's tenth request to Fox and ninth request to Grey). Charles has not contested this representation; indeed, in his filings, he does not list these records among his outstanding requests. As a result, we hold that Charles's requests for these records are moot.

### B. The public-records requests

{¶ 26} The Public Records Act, R.C. 149.43, requires a public office to promptly make copies of public records available to any person upon request. R.C. 149.43(B)(1). A "public record" is a record "kept by any public office." R.C. 149.43(A)(1). Mandamus is an appropriate action by which to compel compliance with the Public Records Act. R.C. 149.43(C)(1)(b); *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6.

{¶ 27} To be entitled to the writ, Charles must demonstrate by clear and convincing evidence that he has a clear legal right to the requested relief and that the county has a clear legal duty to provide that relief. *See State ex rel. Cincinnati Enquirer v. Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, ¶ 10. Ohio's Public Records Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 376, 662 N.E.2d 334 (1996).

{¶ 28} The two offices involved here, the Mercer County prosecuting attorney and the Mercer County sheriff, are public offices subject to the requirements of the Public Records Act. *State ex rel. McCaffrey v. Mahoning Cty. Prosecutor's Office*, 133 Ohio St.3d 139, 2012-Ohio-4246, 976 N.E.2d 877, ¶ 1; *State ex rel. Rocker v. Guernsey Cty. Sheriff's Office*, 126 Ohio St.3d 224, 2010-Ohio-3288, 932 N.E.2d 327, ¶ 14. Because the county has invoked a number of statutory exceptions to the Public Records Act's disclosure requirement, it bears the burden of proof with respect to those exceptions. *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 398, 732 N.E.2d 373 (2000). To meet this burden, a custodian must prove that the requested records fall squarely within the exception. *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, 995 N.E.2d 1175, ¶ 23.

**1. The evidence that Charles was a designee for Christopher**

{¶ 29} As an initial matter, the county cites R.C. 149.43(B)(8) as one basis for its refusal to comply with *any* of Charles's public-records requests. R.C. 149.43(B)(8) states that there is no duty to provide to an inmate "any public record concerning a criminal investigation or prosecution" unless "the judge who imposed the sentence * * * finds that the information sought in the public record is necessary to support what appears to be a justiciable claim of the person." For example, an inmate who seeks records of his arraignment cannot compel the production of those public records without a finding by the sentencing judge that the record supports a valid claim. *McCain v. Huffman*, 151 Ohio St.3d 611, 2017-Ohio-9241, 91 N.E.3d 749, ¶ 12.

{¶ 30} The county contends that R.C. 149.43(B)(8) applies in this case because Charles was acting as Christopher's designee, citing *State ex rel. Barb v. Cuyahoga Cty. Jury Commr.*, 128 Ohio St.3d 528, 2011-Ohio-1914, 947 N.E.2d 670 ("*Barb II*"). In that case, the Eighth District Court of Appeals held that Herbert Barb was acting as his inmate-brother Danny's "designee" in requesting records

related to Danny's conviction. *State ex rel. Barb v. Cuyahoga Cty. Jury Commr.*, 8th Dist. Cuyahoga No. 95005, 2010-Ohio-6190, ¶ 7 ("*Barb I*"). The court of appeals denied the writ for two reasons. First, Danny had already made four prior unsuccessful attempts to obtain a writ of mandamus, so res judicata applied to requests made by Danny, whether directly or indirectly. *Id*. at ¶ 11-12. And second, even if it were the first request, Herbert would still be bound by the restriction upon Danny: "Herbert may not do indirectly what Danny is prohibited from doing directly," namely secure the documents without the approval of the trial judge required by R.C. 149.43(B)(8). *Id*. at ¶ 13. On appeal, we affirmed, citing both bases for denying the writ. *Barb II* at ¶ 1.

{¶ 31} A "designee" is "[s]omeone who has been designated to perform some duty or carry out some specific role." *Black's Law Dictionary* 541 (10th Ed.2014). And to "designate" means "[t]o choose (someone or something) for a particular job or purpose." *Id*. Thus, the term connotes some intentional agency. In his affidavit, Charles attests, "I am not now nor have I at any other time acted as a designee of Mr. Christopher Summers."

{¶ 32} The county claims, to the contrary, that the evidence confirms that Charles was acting as Christopher's designee. It asserts that "Christopher's inmate emails and phone calls establish that [Charles] is posting items on the Facebook page at the explicit instruction of Christopher." It points to an e-mail to Christopher dated February 4, 2018, in which Charles wrote, "you tell mom exactly what you want put on the FB page and she will." Along the same lines, the county claims that "[i]n an email dated November 18, 2018, Christopher gives detailed instructions" to a private investigator named Jack Bastian "on how the public records request by Joyce White to Darke County should be handled." And the county cites other telephone calls and e-mails in which Christopher and Charles discuss whether to post videos of the witnesses on the Facebook page.

{¶ 33} However, this evidence has little probative value for proving that Charles was acting as Christopher's designee when he requested public records. The e-mail from Charles quoted above was written over one year *after* Charles sent his first public-records request, and the e-mail does not mention those requests. And the county's own evidence suggests that Bastian and White were hired not by Charles or Christopher but by Jeffrey Rasawehr, who operates the website www.countycoverup.com and the Facebook page "County Cover-up," which also publishes articles about Christopher's criminal case. Essentially, the county invites us to assume that if Christopher was directing his father in the operation of the Facebook page, then he must have also been the driving force behind the requests. But an assumption does not rise to the level of clear and convincing proof necessary to apply an exception to the Public Records Act. *See State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 22-23 (public-records custodian bears the burden of proving that a statutory exception to disclosure applies to the facts of the specific case).

{¶ 34} In lieu of direct evidence that Charles submitted his public-records requests at Christopher's behest, the county implicitly asks us to adopt a presumption of agency. In *Barb I*, the court of appeals discerned a designee relationship from the fact that the requester was seeking the records in an effort to prove that Danny Barb was denied a fair trial. *Barb I*, 8th Dist. Cuyahoga No. 95005, 2010-Ohio-6190, at ¶ 7. Similarly, here, the county contends that Charles was serving the interests of Christopher by requesting the records and that his intent to benefit Christopher should make him subject to the same requirement of prior court approval as Christopher. But by its plain terms, R.C. 149.43(B)(8) applies to requests from an inmate; there is no textual basis for extending the statutory language to someone who simply wants to benefit an inmate.

{¶ 35} Alternatively, the county asks us to fashion a per se rule creating an irrebuttable presumption that all family members within a certain degree of

consanguinity are acting as designees when they seek criminal records relating to their imprisoned relations. But when a statute is clear and unambiguous, a court must apply the statute as written, without inserting or deleting words. *Dundics v. Eric Petroleum Corp.*, 155 Ohio St.3d 192, 2018-Ohio-3826, 120 N.E.3d 758, ¶ 7. Had the General Assembly wished to curtail public access to court records in such a broad, categorical fashion, it would have included express language to that effect in the Public Records Act. *See*, *e.g.*, *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 26 ("had the General Assembly intended to require that electric-distribution utilities prove that carrying costs were 'necessary' before they could be recovered, it would have chosen words to that effect").

{¶ 36} For these reasons, we hold that the county has failed to prove that Charles was a designee subject to R.C. 149.43(B)(8). Therefore, the county was not entitled to invoke that exception as a basis for its refusal to produce the records.

## 2. The first request to Fox

{¶ 37} In his first request to Fox, Charles asked for the video recordings of interviews with J.K. and other witnesses in the criminal case against Christopher. Fox withheld four video recordings of interviews of J.K., conducted on November 5, 6, 7, and 9, 2012. In addition, Fox refused to provide the video recordings of interviews with five witnesses: (1) L.P. on November 16, 2012, (2) D.W. on November 26, 2012, (3) D.B. on January 31, 2013, (4) K.N. on July 11, 2013, and (5) K.F. on July 11, 2013. The county contends that Charles's request for these videos is moot. Alternatively, it argues that these videos are exempt from disclosure due to (1) the R.C. 149.43(A)(1)(v) exception for records protected from disclosure by federal law, (2) the protections of Marsy's Law, (3) the exception for "confidential law enforcement investigatory records," (4) the trial-preparation privilege, and (5) the attorney-work-product privilege.

### a. Mootness

{¶ 38} As previously noted, the Darke County prosecutor provided records to White in response to her public-records request. The county alleges that Charles's public-records requests for video recordings of the witness interviews are moot because Charles already has possession of the videos. We reject this contention.

{¶ 39} Nothing in the text of the Public Records Act excuses a public office from its duty to supply records upon a showing that the requester has obtained the record from a third party. Thus, the fact that Charles may already have received some of the requested records from another source does not render his requests moot.

### b. J.K.'s right to privacy under federal law and Marsy's Law

{¶ 40} R.C. 149.43(A)(1)(v) exempts from the Public Records Act records "the release of which is prohibited by state or federal law." The county and J.K. assert two legal prohibitions on disclosure, based on J.K.'s alleged right to privacy concerning the details of the crimes against her.

{¶ 41} First, they assert that a victim of rape or sexual assault has a constitutional right to privacy concerning the details of the crime, which should exempt that information from disclosure. In support, they rely on *Bloch v. Ribar*, 156 F.3d 673 (6th Cir.1998), which declared that "a rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no penological purpose is being served." *Id.* at 686. According to J.K. and the county, that privacy interest satisfies the R.C. 149.43(A)(1)(v) exception. But *Bloch*, which dealt with a civil-rights claim under 42 U.S.C. 1983, is of limited value here. The holding cited by the county and J.K. resulted from an equitable weighing of the victim's privacy interests against the state's interests favoring disclosure. *Bloch* at 686. *Bloch* is not a public-records case and it did not create the categorical exception to

14

disclosure under federal law required by R.C. 149.43(A)(1)(v). *See, e.g., State ex rel. ESPN, Inc. v. Ohio State Univ.*, 132 Ohio St.3d 212, 2012-Ohio-2690, 970 N.E.2d 939, ¶ 25 (the Family Educational Rights and Privacy Act, 20 U.S.C. 1232g, which requires schools receiving federal funds to keep sensitive student information confidential, is a prohibition on the release of records). As a result, J.K. and the county have failed to show that federal law prohibits disclosure of the witness-interview video recordings.

{¶ 42} Second, the county asserts that J.K. has privacy rights under Ohio Constitution, Article I, Section 10a ("Marsy's Law") and that those rights preclude dissemination of the requested information. Marsy's Law seeks to "secure for victims justice and due process *throughout the criminal and juvenile justice systems*" by affording certain rights, among them the right "to be treated with fairness and respect for the victim's safety, dignity, and privacy." (Emphasis added.) Ohio Constitution, Article I, Section 10a(A)(1). But Marsy's Law does not provide an exception to the Public Records Act here. This case is a civil dispute over the release of public records relating to a criminal matter that is no longer ongoing. Consequently, Marsy's Law does not provide a basis for the county to deny Charles's public-records requests.

### c. *Confidential law-enforcement investigatory techniques*

{¶ 43} The county next asserts that the witness interviews are exempt from disclosure as "confidential law enforcement investigatory records," R.C. 149.43(A)(1)(h). The Public Records Act defines such records as "any record that pertains to a law enforcement matter of a criminal * * * nature, but only to the extent that the release of the record would create a high probability of disclosure of * * * [s]pecific confidential investigatory techniques or procedures," R.C. 149.43(A)(2)(c). The county contends that disclosing the video recordings of the interviews with J.K. and the five witnesses "will substantially impact future investigations."

{¶ 44} In support of this argument, the county proffers an affidavit from Baker, who attests that interviewing sexual-assault victims is a "sensitive issue" that "requires special techniques and a thorough understanding of the sexual assault victim's mind set." Baker emphasizes the importance of establishing rapport with the victim, but she never identifies a specific technique that must not be disclosed. Nor does she explain what is "confidential" about trying to win the confidence of a witness or crime victim or approaching the interview with a heightened degree of sensitivity. Instead, Baker expresses concern that releasing the interviews will traumatize victims and impair Baker's ability to win the confidence and trust of future victims. Several amici raise similar concerns, but they also fail to identify the specific technique at issue or explain why such a technique must remain confidential.

{¶ 45} At most, Baker's affidavit and the amici's arguments raise a policy concern. But such concerns do not create an investigative technique or make such a technique confidential. As a result, there is no merit to the assertion that the witness interviews are records of confidential law-enforcement investigatory techniques exempt from disclosure under R.C. 149.43(A)(1)(h).

### d. Trial-preparation records

{¶ 46} The county next contends that the video recordings of the witness interviews are exempt from disclosure, under R.C. 149.43(A)(1)(g), as trial-preparation records. The Revised Code defines "[t]rial preparation record" as "any record that contains information that is specifically compiled in reasonable anticipation of, or in defense of, a civil or criminal action or proceeding, including the independent thought processes and personal trial preparation of an attorney." R.C. 149.43(A)(4).

{¶ 47} The county takes the position that *every* document in a prosecutor's file, including investigatory records prepared by other agencies, is a trial-preparation record because "[t]he copies were compiled by the prosecutor or his

assistants in preparation of the Prosecutor's legal theories and trial strategies." But the presence of a record in a prosecutor's file does not, in and of itself, turn something into a trial-preparation record. *Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, at ¶ 15, citing *State ex rel. Carpenter v. Tubbs Jones*, 72 Ohio St.3d 579, 580, 651 N.E.2d 993 (1995). Rather, it is the nature of the record itself that determines its exempt or non-exempt status, and what would otherwise constitute non-exempt records "do not become 'trial preparation records' simply because they are contained within a prosecutor's file." *Carpenter* at 580. This places the recordings of the witness interviews outside of the exception stated in *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 431-432, 639 N.E.2d 83 (1994), and later limited by *State ex rel. Caster v. Columbus*, 151 Ohio St.3d 425, 2016-Ohio-8394, 89 N.E.3d 598, concerning records contained in the prosecution's file.

{¶ 48} Under our caselaw, whether a record is specifically compiled in anticipation of a criminal proceeding often determines whether it constitutes a trial-preparation record. Thus, "general fact-finding investigations do not produce trial-preparation records, as 'such investigations do not meet the "specifically compiled" requirement of the statute.' " *Sage* at ¶ 14, quoting *State ex rel. Coleman v. Cincinnati*, 57 Ohio St.3d 83, 84, 566 N.E.2d 151 (1991), quoting R.C. 149.43(A)(4). But when witness statements to law enforcement are " 'specifically prepared * * * for the sole purpose of providing the prosecutor with the information necessary to present the case to the grand jury and to the jury at the criminal trial,' " they constitute trial-preparation records and the exception applies. (Ellipsis sic.) *State ex rel. Hamblin v. Brooklyn*, 67 Ohio St.3d 152, 153, 616 N.E.2d 883 (1993), quoting *State ex rel. Hamblin v. Brooklyn*, 8th Dist. Cuyahoga No. 58013, 1991 WL 502005, *3 (July 1, 1991).

{¶ 49} None of law enforcement's interviews of J.K. fall within the statutory definition of trial-preparation records. The first interview of J.K. occurred

on November 5, 2012, two days before a criminal complaint was filed against Christopher. It was conducted by a uniformed deputy sheriff at the office of the county sheriff. There is no evidence that attorneys for the state played any role in the interview or that the interview was conducted in preparation for trial rather than to gather information in the course of investigating a potential crime. The same is true of the interviews with J.K. conducted on November 6, 7, and 9, 2012, which were conducted by plain-clothes detectives in the same meeting room. While the detective's statement, in the November 9 interview, that "next week, Thursday, I'll be presenting the case to the grand jury" suggests the interview was to help the detective prepare for his appearance, the county has not presented evidence that this interview occurred at the prosecutor's instigation or even with the prosecutor's knowledge. All told, none of the police interviews of J.K. meet the definition of a trial-preparation record.

{¶ 50} This leaves the video recordings of law enforcement interviewing the five other witnesses. But of these remaining interviews, only two, the July 11, 2013 interviews of K.N. and K.F, were for the purpose of trial preparation, rather than general investigation. In each interview, the interviewing detectives informed the witness that Christopher's trial was imminent and that they were collecting information in anticipation of and for possible use at trial. For this reason, the recordings of the interviews of K.N. and K.F. can be reasonably understood to meet the statutory definition of trial-preparation records and are not subject to production. The other interviews, however, lack such indicia do not qualify as trial-preparation records under the statutory definition.

{¶ 51} Finally, the county asks us to craft a new exception to the Public Records Act to protect the privacy of witnesses, based on Sup.R. 12(C)(2), which requires judges to "inform victims and witnesses of their right to object to being filmed, videotaped, recorded, or photographed." The county suggests that "[i]t makes little sense to protect a witness from such invasions at trial, only to require

that same type of record to be made public simply because it occurs prior to trial." However, as noted above, the General Assembly, not the court, is the "ultimate arbiter of policy considerations relevant to public-records laws." *Kish v. Akron*, 109 Ohio St.3d 162, 2006-Ohio-1244, 846 N.E.2d 811, ¶ 44.

{¶ 52} For these reasons, we hold that the county has established the applicability of the trial-preparation exception to only two of the nine witness-interview video recordings, those of K.N. and K.F.

### e. The attorney-work-product doctrine

{¶ 53} Alternatively, the county argues that the records are beyond the scope of the Public Records Act based on the attorney-work-product doctrine. The work-product doctrine is a discovery privilege, codified in Civ.R. 26(B)(4), that requires a showing of good cause before a party may obtain trial-preparation materials from an adverse party or that party's counsel.

{¶ 54} The Public Records Act has adopted a work-product protection in one narrow context. A record may be a "[c]onfidential law enforcement investigatory record" if releasing it would create a high probability of disclosing "specific investigatory work product." R.C. 149.43(A)(2)(c). The exception for specific investigatory work product "does not extend beyond the completion of the trial of the underlying criminal case at issue." *Caster*, 151 Ohio St.3d 425, 2016-Ohio-8394, 89 N.E.3d 598, at ¶ 1. The scope of specific investigatory work product under R.C. 149.43(A)(2)(c) is modeled on the attorney-work-product privilege. *See State ex rel. Cincinnati Enquirer v. Ohio Dept. of Pub. Safety*, 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258 ¶ 41 (applying "the principles of attorney work product" to define the scope of specific investigatory work product).

{¶ 55} But the exception for specific investigatory work product is a law-enforcement exception. The Public Records Act contains no exception for attorney work product, except insofar as attorney work product constitutes trial-preparation records. *See State ex rel. Dist. 1199, Health Care & Social Serv. Union, SEIU,*

*AFL-CIO v. Gulyassy*, 107 Ohio App.3d 729, 737, 669 N.E.2d 487 (10th Dist.1995) (noting that the Public Records Act "exceptions mention attorney 'work product' only as it concerns preparation for litigation, and [mention] investigatory work product only as it concerns confidential law enforcement investigatory records").

> "[T]he work product doctrine is not intended to remove public records from availability to the public merely because they are also used for litigation. Hence, Civ.R. 26(B)(3) does not authorize a governmental unit to except from R.C. 149.43 public records which are otherwise required to be made available for inspection."

(Brackets sic.) *State ex rel. Parisi v. Heck*, 2d Dist. Montgomery No. 25709, 2013-Ohio-4948, ¶ 10, quoting *State v. Weir*, 10th Dist. Franklin No. 79AP-423, 1980 WL 353222 (Jan. 10, 1980). Thus, the attorney-work-product privilege is not an independent basis for shielding records from disclosure under the Public Records Act.

{¶ 56} Because we have held that the trial-preparation exception is inapplicable, we conclude that the attorney-work-product privilege similarly does not shield these records from disclosure.

{¶ 57} Having rejected the county's defenses against disclosure, we grant the writ of mandamus as to the records responsive to Charles's first request to Fox, with the exception of the recordings of the interviews of K.N. and K.F.

### 3. The second request to Fox

{¶ 58} The county withheld 14 audio recordings that were responsive to Charles's second request: 5 telephone calls between J.K.'s mother and the Mercer County Sheriff's Office; an audio recording of a "threatening" telephone call from Christopher to J.K.; audio recordings of interviews with H.F., J.K., L.N., L.S., V.M,

and W.B.; a voicemail Laurie Summers left for J.K.; and an audio recording of the *Miranda* warning given to Christopher.

{¶ 59} The county asserts that Charles's claim regarding these records is "most likely moot" because Charles is "presumably" in possession of the audio recordings because the Darke County prosecutor produced them to White. But here again, the county has not proved that the Darke County prosecutor gave all of these items to White or that White gave them to Charles. Nor has the county cited caselaw to establish that a public office does not have to produce public records to a requester who is known or believed to have obtained those records from a different source.

{¶ 60} Alternatively, the county argues that these materials qualify as trial-preparation records. But it has not alleged that they contain information "specifically compiled in reasonable anticipation of, or in defense of, a civil or criminal action." R.C. 149.43(A)(4). For example, harassing telephone calls from the Summers family to J.K. would not qualify as trial-preparation records. Instead, the county claims they are exempt *solely* because Fox utilized them in preparation for the criminal trial. But as explained above, materials are not rendered exempt from disclosure simply by their placement in a prosecutor's file. Because there is no evidence that these records were specifically prepared for trial, they do not enjoy any privilege and are not exempt from disclosure. *Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, at ¶ 16.

{¶ 61} We grant the writ of mandamus as to the records responsive to Charles's second request to Fox.

### 4. The third request to Fox

{¶ 62} The records responsive to Charles's third request consist of 92 pages of lined paper containing hand-written notes made by Fox. Such personal notes are outside the scope of the Public Records Act.

{¶ 63} R.C. 149.43(A)(1) defines "public record" as a record kept by any "public *office*." (Emphasis added.) "It does not define a 'public record' as any piece of paper on which a public officer writes something." *State ex rel. Steffen v. Kraft*, 67 Ohio St.3d 439, 440, 619 N.E.2d 688 (1993). In *Steffen*, we held that a judge's personal notes, taken during trial, were "kept for the judge's own convenience and not official records," and that "permitting a litigant access to a judge's personal trial notes would intrude upon a judge's subjective thoughts and deliberations." *Id.* The same considerations pertain to counsel's notes.

{¶ 64} Charles argues that personal notes *are* subject to the Public Records Act if the notes are maintained for future reference, citing *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419. *Pietrangelo* arose out of an incident at a skate park, during which officers spoke with people at the park and took notes to use when preparing an incident report. *Id.* at ¶ 3. We found that the notes had been destroyed and therefore could not be produced. *Id.* at ¶ 20. Pietrangelo had alleged that the police department's recordkeeping system required that notes regarding violations of skate-park rules be maintained at the department for future reference. *Id.* at ¶ 19. But if that were true, then the notes would not have been *solely* for the officers' personal use. In this case, by contrast, there is no evidence or allegation that the prosecutor's office has a policy of maintaining attorney notes for future reference in other cases.

{¶ 65} After noting the general rule that personal notes are generally exempt from disclosure but acknowledging that a custom of keeping the notes for future reference might change their status, our opinion in *Pietrangelo* made two additional observations: that Pietrangelo believed that the notes contained information not in the incident report and that the city admitted in its answer that this might be the case. Based on this dictum, Charles argues that personal notes are subject to disclosure if they contain exonerating information not in a public report.

{¶ 66} But we did not adopt such a rule in *Pietrangelo*, and we decline to do so now. Personal notes fall outside the scope of the Public Records Act due to the circumstances of their creation: when the notes are taken by an official for his own personal convenience and are not required to be maintained, they are not records of the *office*. This distinguishes the personal-notes exception from other exceptions (for example, the attorney-client privilege) that depend for their existence on the substance of the information contained in the record. We fail to see why personal notes might lose their exempt status simply because they contain information that is not included in an official report.

{¶ 67} We deny the writ of mandamus as to the personal notes sought in Charles's third request to Fox.

### 5. The sixth request to Fox

{¶ 68} With respect to Charles's sixth request, Fox submitted three computer files to the court under seal, but most of the documents contained therein are not responsive to the request. The first two files contain correspondence between the prosecutor's office and individuals in the Ohio Attorney General's Cybercrimes Unit or the Bureau of Criminal Investigation, not correspondence sent to potential defense witnesses.

{¶ 69} The third file contains 27 letters to prospective trial witnesses signed by Fox. The first 17 letters are beyond the scope of the request because they were sent to the state's potential witnesses, not to defense witnesses.

{¶ 70} The remaining ten letters, dated June 19, were sent to witnesses identified by the defense. The county argues that these letters constitute trial-preparation records because "any correspondence between [Fox] and potential witnesses regarding testimony at a pending criminal trial would necessarily contain information that was compiled in anticipation of the trial" and would reveal his trial strategy and preparation. However, a review of the letters shows that they do not contain any substantive information that would be unknown to the defense. The

letters merely indicate that the prosecutor wishes to speak with the defense witnesses. But the letters give no indication as to the substantive topics he will discuss with those witnesses or what their trial testimony might be, and they therefore do not reveal his trial strategy.

{¶ 71} We therefore grant a writ of mandamus as to those ten letters, which are responsive to Charles's sixth request to Fox.

### 6. The eighth request to Fox

{¶ 72} Fox initially denied Charles's eighth request on the ground that the requested correspondence was attorney work product (even though the request expressly sought communications with opposing counsel). In this litigation, the county has abandoned that defense and instead asserts that the request is overbroad. We reject that contention.

{¶ 73} A person who wishes to inspect public records must identify the records at issue with reasonable clarity. *State ex rel. Zidonis v. Columbus State Community College*, 133 Ohio St.3d 122, 2012-Ohio-4228, 976 N.E.2d 861, ¶ 21. The Public Records Act "does not contemplate that any individual has the right to a complete duplication of voluminous files kept by government agencies." *State ex rel. Warren Newspapers, Inc. v. Hudson*, 70 Ohio St.3d 619, 624, 640 N.E.2d 174 (1994). Thus, a request that seeks duplication of entire categories of documents is overly broad and may be denied on that basis. *See*, *e.g.*, *Zidonis* at ¶ 23 (request for whole categories of complaint and litigation files without any limitation as to content or time period was overbroad).

{¶ 74} As a general rule, a public official may assert a public-records exception in litigation that the official did not raise in the initial rejection letter. *See*, *e.g.*, *McDougald v. Greene*, ___ Ohio St.3d ___, 2020-Ohio-4268, ___ N.E.3d ___, ¶ 18 (Kennedy, J., dissenting) (noting that respondent abandoned his original legal theory when the mandamus complaint was filed). But permitting a public official to oppose a request as overbroad for the first time in litigation would enable

the official to avoid the duty, when denying a request as overly broad, to "provide the requester with an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office and accessed in the ordinary course." R.C. 149.43(B)(2). Having failed to allow Charles the opportunity to cure, the county cannot assert an overbreadth objection now.

{¶ 75} Moreover, Charles's request is not comparable in its breadth to those we have previously rejected. He requested correspondence with specific parties (Christopher's defense attorneys) relating to a specific topic (Christopher's criminal case). The county has not presented evidence that the manner in which such records are maintained in Fox's office—or the number of employees whose files would need to be searched—made the request prohibitively difficult to comply with. Indeed, in response to this court's order, Fox located and filed under seal 13 e-mail chains between employees in his office and Christopher's attorneys.

{¶ 76} Because the county has presented no argument that these e-mail chains are exempt from disclosure, we grant a writ of mandamus as to the 13 e-mail chains, which are responsive to Charles's eighth request to Fox.

### 7. The ninth request to Fox

{¶ 77} Relevant to Charles's ninth request, J.K. provided three written statements to the sheriff's office: a five-page undated statement, a two-page statement dated January 4, 2013, and a one-page statement describing events that occurred on April 26, 2013. With respect to the first two statements, the county reiterates arguments that we rejected in our analysis of the video recordings: that the claims are moot because Charles already obtained them from Darke County and that they are exempt from disclosure because they contain details of the sexual offenses.

{¶ 78} As for the third statement, the county questions whether it qualifies as a "statement" because it is only one paragraph long. But Charles's request for J.K.'s written statements was not conditioned on their lengths.

**{¶ 79}** We grant a writ of mandamus as to J.K.'s three witness statements, which are responsive to Charles's ninth request to Fox.

### 8. The requests to Grey

**{¶ 80}** Charles sent nine requests to Grey. As noted above, Charles's fourth, fifth, sixth, and ninth requests to Grey were resolved in mediation. Charles is no longer seeking relief as to those requests. Charles's first, second, and eighth requests to Grey (for video and audio recordings of witness interviews and for written statements made by J.K.) are identical to his first, second, and ninth requests to Fox, and Grey relies on the same arguments made by Fox. We therefore grant a writ of mandamus as to those requests (except for the recordings of the July 11, 2013, interviews with K.N. and K.F.) for the reasons set forth above.

**{¶ 81}** In his third request to Grey, Charles demanded copies of notes taken by detectives during interviews with J.K. or other witnesses. The county asserts that Grey is "not in possession of responsive records" with respect to Charles's third request. But that is not accurate. The files submitted for review in response to Charles's seventh request to Grey—seeking correspondence between the sheriff's office and the prosecutor's office—contain 11 pages of witness-interview notes prepared by Detective Doug Timmerman. The pages are captioned "Investigator Notes" or "Follow Up Investigation Notes."

**{¶ 82}** The county suggests that even *if* such records exist, they are not public records because they are for personal use. But that claim is inconsistent with the evidence in the record: Timmerman sent those notes to Fox to assist him with his case preparation, as evidenced by the cover e-mail. The notes were thus not prepared solely for the detective's personal use. We grant a writ of mandamus as to the 11 pages of notes, which are responsive to Charles's third request to Grey.

**{¶ 83}** In his seventh request to Grey, Charles sought correspondence between the Mercer County Sheriff's Office and the Mercer County Prosecutor's Office relating to Christopher's case. Relevant to this request, the county submitted

three computer files of responsive records under seal, totaling 71 pages. It opposes this request based on overbreadth, the attorney-client privilege, the work-product privilege, and the trial-preparation privilege.

{¶ 84} With respect to overbreadth, the county has merely asserted the defense without offering any support. The request is more specific than those that courts have deemed overly broad, as discussed above. The county's true objection appears to be that the request is burdensome, but it has offered no evidence in support. We cannot simply credit a bare assertion that a request is overbroad or burdensome.

{¶ 85} Next, the county invokes the attorney-client privilege. "Records of communications between attorneys and their state-government clients pertaining to the attorney's legal advice are excepted from disclosure under R.C. 149.43(A)(1), since the release of those documents is prohibited by state law." *State ex rel. Thomas v. Ohio State Univ.*, 71 Ohio St.3d 245, 249, 643 N.E.2d 126 (1994). However, the privilege extends only to government agencies consulting with counsel "for legal advice or assistance." *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 30.

{¶ 86} With a few exceptions, the 71 pages at issue do not reflect the sheriff seeking—or the prosecutor providing—legal guidance. To the contrary, the majority of the communications are from the sheriff, offering information and assistance to the prosecutor (as in the instance discussed above, in which Detective Timmerman sent his interview notes to Fox). However, three pages in the file that is titled "Prosecutor Emails with Sheriff" must be redacted. The e-mails on pages 38, 39, and 41 all contain discussions in which Detective Timmerman asks Fox for legal guidance. Those pages must be redacted because they contain attorney-client communications.

{¶ 87} Finally, the county argues that these e-mails are subject to the work-product and trial-preparation exceptions. Insofar as the e-mails are work product,

the exception would have expired at the conclusion of Christopher's original trial, as explained above. Similarly, there is no indication these records were specifically prepared in reasonable anticipation for trial. As such, they do not meet the statutory definition of trial-preparation materials and do not qualify for that statutory exemption.

{¶ 88} For these reasons, we grant a writ of mandamus as to Charles's seventh request to Grey, except for the pages identified above.

## IV. CONCLUSION

{¶ 89} For the reasons set forth above, we grant a writ of mandamus as to Charles's first, second, sixth, eighth, and ninth requests to Fox (except for the recordings of the July 11, 2013 interviews with K.N. and K.F.); we deny the writ as to Charles's third request to Fox; and we deny the writ as moot with respect to Charles's remaining requests to Fox. We grant a writ of mandamus as to Charles's first, second, third, seventh, and eighth requests to Grey (except for the recordings of the July 11, 2013 interviews with K.N. and K.F. and with redactions to the records responsive to the seventh request, as explained above); and we deny the writ as moot with respect to Charles's remaining requests to Grey. Charles may file a supplemental pleading on the subject of court costs, statutory damages, or attorney fees within two weeks of the date of this decision. The county will then have two weeks in which to respond.

Writ granted in part

and denied in part.

KENNEDY, FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

FRENCH, J., concurs in part and dissents in part, with an opinion joined by O'CONNOR, C.J.

———————————

**FRENCH, J., concurring in part and dissenting in part.**

{¶ 90} Although I concur in the majority's disposition of the pending motions, I respectfully dissent from the issuance of a writ of mandamus to compel respondents, Mercer County Prosecuting Attorney Mathew Fox and Mercer County Sheriff Jeff Grey, to produce the public records that relator, Charles A. Summers, has requested. Because I conclude that Charles is acting as a designee of his incarcerated son, Christopher Summers, and because neither he nor Christopher has complied with R.C. 149.43(B)(8), I would deny the writ.

{¶ 91} Christopher pleaded guilty to eight counts of sexual battery in violation of R.C. 2907.03, which prohibits sexual conduct between a teacher or coach and a student who is enrolled at the school where the teacher or coach is employed. The Third District Court of Appeals affirmed Christopher's convictions and 20-year aggregate prison sentence. *State v. Summers*, 2014-Ohio-4538, 21 N.E.3d 632, ¶ 53 (3d Dist.).

{¶ 92} In February and March 2017, Charles requested from respondents public records concerning the investigation of the charges against Christopher and the prosecution of his criminal case. Respondents denied Charles's requests. As relevant here, respondents stated that as Christopher's father, Charles had to comply with R.C. 149.43(B)(8) by obtaining approval from the judge who had sentenced Christopher before Charles could demand records relating to Christopher's criminal case. Charles denies that he was acting as Christopher's designee when he submitted the public-records requests, and he now seeks a writ of mandamus ordering respondents to produce the requested records. After this court granted an alternative writ of mandamus, 156 Ohio St.3d 1440, 2019-Ohio-2496, 125 N.E.3d 903, Charles filed an affidavit and exhibits in support of a peremptory writ and respondents filed six volumes of evidence in opposition to Charles's claim.

{¶ 93} Generally, the Public Records Act, R.C. 149.43, requires a public office or a person responsible for public records to make copies of public records available to a requester at cost and within a reasonable time. R.C. 149.43(B)(1).

The requester's purpose for seeking public records is normally immaterial. *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 427, 639 N.E.2d 83 (1994), *overruled on other grounds*, *State ex rel. Caster v. Columbus*, 151 Ohio St.3d 425, 2016-Ohio-8394, 89 N.E.3d 598. But R.C. 149.43(B)(8), which restricts an inmate's ability to demand public records, creates an exception in which an inmate's purpose for seeking records relating to a criminal investigation or prosecution is dispositive. *State ex rel. Barb v. Cuyahoga Cty. Jury Commr.*, 8th Dist. Cuyahoga No. 95005, 2010-Ohio-6190, ¶ 6 ("*Barb I*").

**{¶ 94}** R.C. 149.43(B)(8) states:

> A public office or person responsible for public records is not required to permit a person who is incarcerated pursuant to a criminal conviction * * * to inspect or to obtain a copy of any public record concerning a criminal investigation or prosecution * * * unless the request to inspect or to obtain a copy of the record is for the purpose of acquiring information that is subject to release as a public record under this section and the judge who imposed the sentence * * * with respect to the person, or the judge's successor in office, finds that the information sought in the public record is necessary to support what appears to be a justiciable claim of the person.

**{¶ 95}** R.C. 149.43(B)(8) restricts an inmate's ability "to obtain what would otherwise be easily obtainable by" a noninmate. *State ex rel. Russell v. Thornton*, 111 Ohio St.3d 409, 2006-Ohio-5858, 856 N.E.2d 966, ¶ 15 (addressing identical language previously codified at former R.C. 149.43(B)(4)). "The General Assembly clearly evidenced a public-policy decision to restrict a convicted

30

inmate's unlimited access to public records in order to conserve law enforcement resources." *Id.* at ¶ 14.

{¶ 96} Had Christopher directly submitted to respondents the requests for public records at issue here, R.C. 149.43(B)(8) plainly would have applied, and absent the required finding by his sentencing judge, Christopher would not have been entitled to the requested records. *See State ex rel. Fernbach v. Brush*, 133 Ohio St.3d 151, 2012-Ohio-4214, 976 N.E.2d 889, ¶ 2.

{¶ 97} Although R.C. 149.43(B)(8), by its express terms, applies only to a request by "a person who is incarcerated pursuant to a criminal conviction," we have held that an inmate may not circumvent the requirements of R.C. 149.43(B)(8) by designating a third-party who is not an inmate to request the records on the inmate's behalf, *State ex rel. Barb v. Cuyahoga Cty. Jury Commr.*, 128 Ohio St.3d 528, 2011-Ohio-1914, 947 N.E.2d 670, ¶ 1 ("*Barb II*"). The single-paragraph opinion in *Barb II*, however, affords no indication of the contours of that court-created rule. Nor has this court subsequently provided any additional insight.

{¶ 98} *Barb II* was an appeal of the Eighth District Court of Appeals' judgment denying Herbert Barb's request for a writ of mandamus to compel the production of verdict forms and lists of prospective jurors in criminal cases against his brother, Danny Barb, who was incarcerated as a result of his convictions in one or more of those cases. *Id.*; *Barb I*, 8th Dist. Cuyahoga No. 95005, 2010-Ohio-6190. Previously, Danny had directly requested those same records and had pursued that request unsuccessfully by filing an action for a writ of mandamus. *Barb I* at ¶ 6.

{¶ 99} The Eighth District denied Herbert's request for a writ of mandamus, holding both that res judicata applied and that because Herbert was acting as Danny's designee with respect to the public-records request, he was required to comply with R.C. 149.43(B)(8). *Barb I* at ¶ 7, 12-14. In support of its determination that Herbert was acting as Danny's designee, the court cited

Herbert's statement that he sought the records in a " 'pursuit to obtain documents that would clearly show the violation of [Danny's] right to a fair trial.' " *Id.* at ¶ 7. We likewise characterized Herbert as "Danny's designee" and stated, "Danny cannot circumvent the requirement of R.C. 149.43(B)(8) * * * by designating his brother to request the records for him." *Barb II* at ¶ 1. We held, " 'Herbert may not do indirectly what Danny is prohibited from doing directly.' " *Id.*, quoting *Barb I* at ¶ 13.

{¶ 100} Respondents urge this court to adopt a per se rule that family members of an incarcerated person presumptively act as their incarcerated relative's designee when they request records concerning the relative's criminal case. I agree with the majority's refusal to do so. Neither the statutory language in R.C. 149.43(B)(8) nor this court's adoption of a designee rule in *Barb II* supports the broad presumption that respondents propose. And although I do conclude that Charles is acting as Christopher's designee, it is not simply Charles's status as Christopher's father that convinces me.

{¶ 101} That said, I would not require—and, indeed, this court has never before required—the type of express, direct delegation of authority that the majority claims is missing here in order to require a noninmate to comply with R.C. 149.43(B)(8). In *Barb II*, we affirmed the Eighth District's determination that Herbert was acting as Danny's designee based solely on Herbert's statement that his intent was to demonstrate that Danny did not receive a fair trial. Neither the Eighth District nor this court cited any evidence that Danny had expressly and directly asked Herbert to make the public-records request on his behalf.

{¶ 102} The evidence that Charles is acting on Christopher's behalf here is every bit as strong as, if not stronger than, the evidence of agency in *Barb II*. In 2015, Charles and Vicki Summers, Christopher's mother, created a Facebook page called "Justice for Chris" with the "hope that everyone who knows [them] will learn the whole truth about what happened to [their] son." They have since used the

Facebook page as a platform to attack both public officials connected with Christopher's case and the victim of Christopher's offenses, as well as to implicate in possible wrongdoing other employees of Fort Recovery High School, where Christopher was employed as a teacher and coach at the time of his offenses. Just as Herbert Barb sought to prove that his brother did not receive a fair trial, Charles and Vicki Summers have used the Facebook page to critique what they see as unfairness in Christopher's prosecution. As early as June 6, 2015, they complained that "[j]ustice has not been served" and posted evidence that they claim should have been presented at Christopher's trial. In aid of their mission to "bring the truth and all the evidence to the light of day," to discredit respondents' version of the facts, and to demonstrate that the relationship between the victim and Christopher—the victim's teacher and coach—had been "consensual," Charles and Vicki posted on the Facebook page documents including text messages between Christopher and the victim, phone records, written statements to the police, and videos of police interviews.

{¶ 103} Just as Charles's status as Christopher's father does not, on its own, establish that he is acting as Christopher's designee, the existence of the Facebook page is likewise insufficient in isolation to establish that fact. But those facts, considered together with the evidence submitted by respondents that Christopher has himself been intimately involved in the efforts to obtain and post information about his criminal case, lead to the conclusion that Charles is acting as Christopher's designee and attempting to accomplish indirectly what Christopher cannot accomplish directly.

{¶ 104} E-mails between Christopher and his parents demonstrate an understanding that documents relating to Christopher's criminal case that came into his parents' possession were *Christopher's* property. Christopher wrote to his parents on January 31, 2018:

> If you have not reviewed the videos, you are not to look at them. If you have viewed them, you are to immediately stop viewing or using them. They are my property. I am directing you to put them away and not to touch them again. Do not make copies or use them in any way. They are not to be used.

{¶ 105} Christopher similarly instructed his wife that the videos are "my legal property" and directed her not to watch, copy, transcribe or use them. Charles subsequently acknowledged that the video of the police interview with the victim is Christopher's property and stated that Christopher could decide whether it should be posted.

{¶ 106} The e-mails between Christopher and his parents also demonstrate that Christopher directed the use of documents relating to his criminal case, including the posting of those documents on the Facebook page. In one e-mail, Christopher suggested that Charles contrast in a Facebook post the victim's trial testimony with her prior statement to police in order to discredit the victim. And as the majority notes, on February 4, 2018, Charles expressly instructed Christopher, "you tell mom exactly what you want put on the FB page and she will." Although these e-mails postdate Charles's public-records requests, they are indicative of an ongoing, joint effort by Christopher and his parents to obtain and use documents concerning the investigation and prosecution of Christopher's criminal case to attack the public officials involved, discredit and disparage the victim, and rehabilitate Christopher's reputation. Viewing the evidence in its entirety and in light of Christopher's direction of his parents' efforts to obtain and post documents relating to his criminal case, I conclude that Charles was acting as Christopher's designee in an attempt to avoid the requirements of R.C. 149.43(B)(8). I would therefore deny Charles's request for a writ of mandamus.

{¶ 107} For these reasons, although I concur in the majority's resolution of the pending motions, I dissent from the majority's judgment granting a writ of mandamus.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

Santen & Hughes and H. Louis Sirkin, for relator.

Zashin & Rich Co., L.P.A., Drew C. Piersall and Jonathan J. Downes; and Mathew K. Fox, Mercer County Prosecuting Attorney, and Amy B. Ikerd, Assistant Prosecuting Attorney, for respondents.

Ohio Crime Victim Justice Center and Elizabeth A. Well, for intervening respondent, J.K.

Rittgers & Rittgers, Konrad Kircher, and Ryan J. McGraw, urging denial of the writ for amici curiae National Crime Victim Law Institute, Ohio Domestic Violence Network, and Ohio Alliance to End Sexual Violence.

Kooperman, Mentel, Ferguson & Yaross, Ltd., Sean A. Mentel, Katherine C. Ferguson, and Lindsay M. Nelson, urging denial of the writ for amicus curiae Buckeye State Sheriffs' Association.

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Jacquenette S. Corgan, Assistant Prosecuting Attorney, urging denial of the writ for amicus curiae Ohio Prosecuting Attorneys Association.

_____